The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good afternoon. We're happy to have you with us. And we're happy to hear argument in our first case number 201120 Wellin v. Farace. You can correct me if I'm wrong. Mr. Humphreys? Yes, ma'am. May it please the Court. Okay. May it please the Court. I'm Badge Humphreys and I represent the estate of Keith Wellin, the appellant, in this appeal of the district court's order granting summary judgment to respondents in this legal malpractice action. The Wellin estate sued Mr. Farace for advising Keith Wellin to enter into a complicated trust transaction without adequately advising Mr. Wellin of the tax consequences of this transaction to him personally, specifically under the 2009 transaction, which is called an installment sale to an intentionally defective grantor trust. Mr. Wellin was personally liable for the capital gains taxes from the sale of any Berkshire Hathaway stock held by the limited partnership, the units of which he had conveyed to an irrevocable trust for the benefit of his children. The evidence in the record. Counsel, I realize there's some complicated transactions in the background, but for our purposes today, as I understand it, we're here only on the summary judgment issue that deals with whether or not Mrs. claims regarding the 2009 transaction. Is that is that correct? Is there anything else that we're supposed to deal with today? Your Honor, I believe that the question before the court is whether or not it was the injury between the two events were of the same nature and whether or not they were readily discoverable and whether or not they were separate and distinguishable. That's what the court ruled in finding that they were not. Right. But as far as as far as we're concerned, as far as we're concerned, the issue is whether or not on those points, the record has sufficient evidence to show this. The jury question, as opposed to permitting the district court to rule as a matter of law on undisputed facts. Right. Your Honor. Right. Your Honor. OK. Just want to be sure. Mr. Humphrey. Yes, Mr. Humphrey. As I understood, you're also raising the issue, are you not, regarding the the tax advice itself? You're saying beyond the question, and correct me if I'm wrong, but you're saying that the estate and Mr. Wellen were not on notice of the potential tax exposure that this intentionally defective Grant Works Trust rendered him liable for. That's correct. That's absolutely correct, Your Honor. OK. Now, is it also correct that that is no longer an active exposure? That is that it's now time barred in terms of the IRS? In terms of the IRS, it is time barred, Your Honor. OK. So what are we left with then in this case? If the tax exposure, and I understand your legal argument regarding the lack of notice, but what are we left with here? Are we now litigating just attorney's fees? Or what else is here in this case? If there is no longer tax exposure due to the statute of limitations on the IRS? No, Your Honor. We have attorney's fees, which is separate. But our primary argument is that Mr. Wellen would not have parted with his units in the limited partnership, but for the failure of Mr. Feras to disclose the risk of the transaction, that he would still have those units. That is, the state would still have those units because he's passed away. So you're saying that had he been given the correct tax advice, he would have declined to enter into the intentionally defective grantors trust? That's precisely right, Your Honor. OK. But if he has no, if the estate has suffered no harm because of this assertively error in not giving the tax advice, what are your damages? The estate has suffered harm, Your Honor, and it's measured by the value of those units that he gave up back in 2009. Well, but if there were, if the purpose of them, which seems to be to benefit the children at that time, and they did benefit the children, the countervailing argument is, OK, he wanted to benefit his children, but he didn't want to hurt himself by this huge tax consequences. We have no hurt to himself now. All we do is has a benefit to the children. Correct, Your Honor. Our claim is that he would not have, if he was properly advised, would not have entered the transaction, therefore would not have traded his units for a promissory note. Well, he knew for sure from the documents that he was benefiting the children. I thought your whole argument was that he didn't know about the tax consequences, which aren't expressly spelled out. But the fact that he's giving the answers to the children is perfectly clear. Right, but he would not have given those assets to the children, Your Honor, if he was properly advised. That's the nature of our claim. Probably advised of the tax consequences. But Judge Keenan has just gone through with you that there were, in fact, no tax consequences. At the end of the day, Your Honor, there were none. But the result of those tax consequences is that he entered into seven years of litigation with his children and spent upwards of $15 million in attorney's fees as a result of the threat of those consequences. So the estate was damaged significantly as a result. So is the measure of damages then the diminution, as you look at it, the diminution in the value of the estate by virtue of the payment of the legal fees for the litigation? Is that the injury? That's part of the injury, Your Honor. And also the loss of the limited partnership units to the irrevocable trust. That's the other element of the injury. Well, if we should conclude, I'm sorry, go ahead. The beneficiary of the partnership units and the underlying asset, the Berkshire Hathaway stock, was to flow to the children. And so I'm presuming they have those now. If the estate had retained either the partnership units or the Berkshire Hathaway stock, wouldn't that have flowed to the children eventually anyway? Under the original will, Your Honor, but not the final will. Under the final will, it would go to charity. That's what Mr. Welland changed his mind about, and it did not go to the children. But there isn't a charity here that's a plaintiff. That's correct, Your Honor. It's still with the estate. So the bottom line is that your injury is the attorney's fees expended by the estate or Mr. Welland litigating over the whole transaction. That's the bottom line of your injury. That's part of it, Your Honor. The other part is the estate's loss of the limited partnership units it would now hold if the transaction was not entered into on false pretenses by Mr. Welland. Why don't you tell us a little bit about the agency and the other issues, the notice issue? Where I'd like to start, Your Honor, is with the court's analysis on whether or not there is a connection between this personal property dispute, and that it's the subject of the February 8th email, and its connection with the 2009 transaction, which is what Judge Norton held was that those two events are of the same nature, and therefore that's the February 8th, 2012 email started the running of the statute of limitation. Those two injuries are certainly not of the same nature, Your Honor, because the 2009 transaction is based on Mr. Ferase's failure to properly advise him about the risk and consequences of the 2009 transaction, whereas a breach of fiduciary duty and conflict of interest is purportedly what is at issue with the February 8th, 2012 email. Additionally, that injury from the 2009 transaction is not readily discoverable. The court sets out a three-prong analysis at JA 1020, and one of those elements is whether or not the injury is readily discoverable. We have expert testimony explaining that the injury from the 2009 transaction was not readily discoverable at 2012, or at any time before he retained a new attorney and was advised as to the risk and consequences of the 2009 transaction, and our cases that we cite are cases that deal with latent defect. Counsel for the defendants even acknowledged that the risk and consequences of the transaction are not revealed by the documents, and that's at JA 691. We rely on the Stoneledge case, which discusses another case of Santee, where it talks about whether or not a crack in a silo would give notice of underlying structural damage in the silo, and the court held that it did not because it was a latent defect. In that instance, there were two cracks in the silo before ultimately, and many years after it was constructed, finding the defect. That's analogous to what happened here. Here, there was not even the same silo, though. We're talking about two completely separate transactions, one dealing with an email that was sent by Mrs. Welland where it raised the issue of her concern about a conflict of divided loyalties, where on the other hand, we're talking about a 2009 transaction that you clearly cannot discover whether or not there was any harm to it as a layman. Again, there's expert testimony on that. In that opinion, the Santee... I'm sorry. No, I think I would be more interested in your focusing on the November 2011 and November 2012 letters from Faraci, which, as I understand the case, are to be sure not what the district court relied on, but are an alternate basis for saying that the decedent was on notice. I understand your use of the wall that has cracks in it, but this is a very, very sophisticated transaction, a very sophisticated decedent, and a very sophisticated tax lawyer. I'm just not sure that the cracks in the wall are quite apropos. Right. I understand, Your Honor, but it talks about expert testimony was required. You certainly don't think that we're bound by your expert testimony? No, Your Honor. I just think it creates an issue of fact. With respect to the 11 and 12 communication, neither of those communications disclosed the risk and consequences of the 2009 transaction at all. All they did was describe it in general terms. Indeed, and was that enough to put the decedent on notice? No, Your Honor. Well, I understand what your answer is, but that's the question. Right. The fact that they didn't spell out the consequences is obvious, but is it sufficient to put him on notice that he's rejecting the claims that you're making now on his behalf? No, Your Honor. That he wants to benefit his children? No, Your Honor. And it goes back to our expert testimony, which says the undisputed testimony, the documents, and the fact that Mr. Whelan was not an experienced estate tax lawyer, he would not have become aware that Ferase failed to inform him of the essential risk and consequences of the sale to a grantor trust until he hired a new attorney in mid-2013, Mr. Edward Bennett. And these are the consequences, correct? I'm sorry? These are the tax consequences that Judge Keenan was discussing with you, correct? Yes, Your Honor, the tax consequences. Which, in fact, these bad tax consequences never came to be, right? At the end of the day, Your Honor, they never came to be. But as a result of those, that's what engaged seven years of litigation against the children and upwards of $15 million in attorney's fees. So there certainly was harm from the tax consequences, just the IRS did not impose it. Well, there were harm to the children, but one could take the position, if you're a child, that the estate shouldn't have sued them because there were no tax consequences. Right, but they were at that time. It had been assessed. What do you mean, they were? The IRS never pursued it. Right, but based on the returns that were filed, they claimed that the tax liability was due, which is what was not disclosed to Mr. Whelan back in 2009, or if until 2013. Mr. Humphreys, if I could ask you a question quickly. Are you contending, though, that subparagraphs F and G of your various causes of action are also not time barred? It seems to me that those were talking about the children and the fact that the money was going to the children, that they could be distinguished from the rest of your complaint. I would have to look at 7G, Your Honor. I'm sorry, I don't have it in front of me. F is in Frank, G as in Pearl. Go ahead and address that on your rebuttal. Okay, thank you. I think it's time for Mr. Stepp. Thank you, Your Honor. May it please the Court, I'm Bobby Stepp and I represent the Appalachians case. The Court is correct that the only issue on this appeal is whether the lower court correctly found that this case was filed more than three years after Keith Whelan knew or should have known that some right of his had been invaded or that some claim against another party might exist. And that decision was correct as a matter of law and ought to be affirmed because it's indisputable in February of 2012, Keith knew or should have known he had suffered his claimed injury, which is the loss of the LP unit, in a transaction he claimed was not explained to him. That was the basis of his first suit against the children. He said, I didn't know what I was doing. By a lawyer he claimed had a conflict of interest. And there's nothing else necessary. Counsel, if I could, I have two questions. One goes to the questions that Judge Keenan raised. If the tax consequences that were feared by Mr. Farras never came to pass as a matter of fact, the implication of the earlier questions was, does the estate have an injury? So that was not a basis upon which the district court ruled. Are you contending as a threshold matter that the estate now doesn't have standing because they don't have an injury? In essence, yes, we didn't frame it as standing, Your Honor, but it's certainly our position that the risk of these tax consequences, the mere fact that the risk existed, was not itself injury. A legal malpractice claim under South Carolina law requires that the conduct beneath the standard of care that proximately causes a risk. If you're correct that there's no injury, that goes directly to our subject matter jurisdiction, which the court on appeal can reach subject matter jurisdiction just as the trial court, but this was never addressed, as I understand it, to the trial court. That's correct, Your Honor. That is correct. I mean, we have always understood the plaintiff's contention as set out in the complaint, although they talk about tax consequences, but as the court has acknowledged, they never came to pass, so they're really not in play at all. Mr. Sepp, if you could, in answering Judge Agee's question, also address the fact that the issue did not become time-barred, was not time-barred at the time the lawsuit was filed. In other words, the three years had not run from Keith Whelan's death until the filing of the bill of the complaint. Isn't that correct? Yes, that's true. He died in, I think, November of 2014. Right, so how does that fit into the answer you give Judge Agee? Well, I don't think any claim based on tax consequences has ever arisen. I mean, whether it's subject matter jurisdiction or whether no claim has ever arisen or whether no clock has ever started, you can't sue for something that didn't come to pass. The anomalous thing in this case is the estate essentially wants rescission of the transaction based on an undisclosed risk, and they want greater relief for a risk that didn't come to pass than they would be entitled to had it come to pass. If those taxes had been assessed, they would have been $40-something million, I think. Well, that would be the measure of damages, and that's what we would be sued for. You didn't tell us that this tax consequence could arise. We got popped with it. It's $45 million. But they want to undo the whole thing. Mr. Humphreys also says, putting aside the tax consequences, real or imagined, as a measure of damages and a factor of injury, that the estate has a separate injury due to attorney's fees incurred by reason of the alleged defective advice, and that is a separate injury that gives them standing. Well, our position is it's not a separate claim and it's not a separate injury. It's all part and parcel of the same loss, the loss of the LP units. That was the subject matter of the litigation, was trying to get them back on the basis that Mr. Welland asserted that he didn't understand what he had done. Have you separately, did you ever assert in the district court that that particular claim is not valid and therefore that the estate lacks standing and has no injury? Well, we did not assert standing. We did not. But our position on the statute of limitations was that there was no separate statute of limitations for that portion of the claimed injury because it's all part and parcel of the loss of the LP units. It's not a separate cause of action. There's no separate cause of action stated in the complaint for that, and it's not a separate element of damage that might have triggered under other circumstances some separate statute of limitations. So any claim to recover the litigation expenses resulted from Keith's assertion that he didn't understand the 2009 transaction, which is the very same claim they're asserting now, the principal damage of which is the loss of the LP units. I mean, that's what they want to recover. That's what they're going to ask the jury court in this case. Well, if we assume, just for purposes of our argument, that the estate has an injury of some sort, as I understand it, and I posed and counseled this at the beginning, the only thing we're here on is what the district court ruled on, which was the grant of summary judgment based on the notice issue. Is that correct? That's the only issue raised on appeal, but, of course, you can affirm on any ground in the hearing. Right, I understand that. But that's the only thing the district court ruled on. That's right. That's right. But I don't think there was occasion for the court to separately address the litigation expenses because they really were never separate. There was no separate claim, and they're just part and parcel of the same damages. South Carolina law is that once you're on notice that some right may have been invaded, once the duty of inquiry is triggered, the law is that the requirement of reasonable diligence to investigate the information takes precedence over the inability to ascertain the amount of damages or even the possibility that damages may be forthcoming at all. So the fact that these are subsequently incurred losses following the loss of the LP units, which is what they want to recover, just doesn't start a separate session on the case to the extent that the claim for loss of the LP units is barred, so would any claim for the litigation expenses. And we do contend. I mean, we don't contend that the estates suffer an injury. We think, as the court has pointed out, this is perfectly consistent with the estate plan that Mr. Welland put in place in a transaction that was fully explained to him in the correspondence that Judge Mott's mission. I mean, he was told unequivocally in January 2010 that he sold his LP units to an irrevocable trust controlled by his children for the benefit of his children in exchange for a promissory note that was discounted from the value of the underlying assets of the LP. If that's not what he wanted to do, or if that's not what he understood he was doing, he had three years from that point to do something about it. And whether Ferre's told him that up front or not is not the question. The question is, when Keith was told that in January 2010, the clock started then. To the extent anything else was required, what the district court found was, well, if the failure to explain is not the wrongful conduct necessary as a part of the statute analysis, well, it was a conflict of interest. And I did want to address the question of Wendy Welland's agency and the scope of that agency with respect to the estate plan, because the estates position tries to isolate a single communication and create some sort of issue of fact. But there really is undisputed evidence in this record, undisputed evidence before Judge Norton, that Wendy serves as Keith's agent, not just with respect to this personal property memorandum, but with respect to his entire estate plan. Tom testified. This is uncontroverted testimony. Tom testified that he routinely communicated with Keith via Wendy and her email account. He testified that Wendy called on Keith's behalf. He testified that Wendy was a conduit to Keith. And Wendy herself described Keith as saying that she was his mouthpiece. So that's all uncontroverted. In addition to which, this February 8th... Okay, excuse me. Excuse me, Mr. Stem. Just because somebody is speaking through someone does not mean that they're clothed with legal authority to take action on their behalf. And it seems to me that you are asking us to make that leap without a factual basis for doing so. Can you point to places in the record that show that she was clothed with legal authority to act on his behalf, rather than merely the relay point for messages? Well, I don't know. I don't know that I can do that, to be perfectly honest. Clothed with legal authority, but I'm not sure that that's necessary. She's clearly speaking for him. Let me walk through the emails that surround the February 8th email, and I think there's no reasonable inference that can be drawn other than the fact that she is acting for Keith with respect to these estate planning issues and that either she is expressing what he knows and understands or whatever she knows and understands is imputed to him because of their relationship. This all starts with this February 8th email in which Wendy says to Tom, Mr. Wellen would like to review his will. Can you send it to me in an email file? Well, she's acting for him, clearly, in that requesting that Keith's will be sent to her so he can review it. That's the same email where she says, I'm concerned about Tom's divided loyalties. We are thinking it through. The estate wants to make an issue about we might be the doctors. That's frankly preposterous. It's Keith and Wendy who are concerned about that. The doctors wouldn't be concerned. Tom responds. He sends the will and revocable trust. Those are the two fundamental estate planning documents for Keith's estate. He says, I'll be happy to talk with you and Keith at your convenience. And then the most important one, I think, is on February 14th, Wendy emails Tom Ferres and says, we went over his will. He does not want to change anything except to add a clause that disclaims things I don't want. We went over his will. She's working with him. He does not want to change anything. She's speaking for him. And that email is- Well, Mr. Stepp, I'm not sure that tells us whether Mrs. Welland is simply conveying his wishes or whether she's acting as if she's his attorney in fact, which I guess is the point the estate makes, is that why wouldn't this be a question of fact instead of a matter of law? He does have, apparently, a very complicated estate plan, which involves a lot of things other than his will. So that, in my mind, raises the question of, even if they were looking at the will, why would that put them on notice of anything with respect to these separate trusts? Well, what they're on notice of- I want to answer that, and if I can, I want to come back to one more email, but I'll answer your question first. These separate trusts are an integral part of the estate plan. It's part of the keys.  The key's always intended to leave a substantial portion of his wealth to his children. And this was a transaction in 2009 that accomplished that with tremendous estate tax benefits to the estate that reduced the estate tax and increased the amount that the children would have received. So that's all part and parcel of when you're looking at the will and the reputable trust, that what's in his estate is the promissory note that he got in exchange for the limited partnership years. So it's all part of the same thing. But if I may, just one more email- Well, it may be part of the same thing in terms of an overall plan, but typically, whether they're irrevocable trusts or they're revocable trusts that become irrevocable upon the death of the grantor, those all operate according to their own terms, independently of the will. I haven't read any of them. I haven't read the will. But that's not unusual, which, again, raises a question in my mind of if you're simply looking at the will, which would deal with whatever's involved in his probate estate, and all these other items would have already been removed from the probate estate, why wouldn't there at least be a question of fact as to the scope? Well, here's my answer to that, Your Honor. A, this 2009 transaction was a substantial transaction that is a part of his estate plan. But in February 2012, Keith is on notice that his lawyer has a conflict of interest with respect to his children. And that 2009 transaction was a $90 million transaction between Keith and his children. If Keith is concerned in 2012 about the personal property memorandum because it overly benefits the children, surely he would be equally concerned, if not more so, about the 2009 transaction that transferred $90 million worth of assets for exchange for a $50 million promise ordinance. Excuse me, does South Carolina law place that burden on a client? You know, I've been reading some of the cases, and I think the True case, True v. Monteith, has a pretty good explanation about saying that the client should be able to rely on the attorney's advice, in this case, the advice regarding potential tax disclosure, and be able to follow the advice without fear that the attorney is not acting in the client's best interest. Now, there's no question that there was an issue regarding the children and the personal property, and at least in my mind, there's a very good argument that subparagraphs F as in Frank and G as in Girl are covered by the statute of limitations, but I don't see why, under True v. Monteith, and the Dean v. Ruscon, and the other South Carolina cases that say that a client only is charged with knowing what ordinarily the injured party knows or should have known by the exercise of reasonable diligence. Because here, sure, he was on notice that the children were getting the money, but there was no notice of the tax exposure that they're claiming was an issue. And I agree with you, IRS can't collect on that anymore, but don't we still have a live claim as to the consequent attorney's fees as a result of this, and as Judge Agee is saying, a question of fact as to whether they were on notice, whether they were on notice about the tax exposure, because I don't see anything in these letters, although they're quite detailed in nature, nothing that talks about exposing him to liability that would render him allegedly illiquid. There's nothing in there, in these letters, about that. That's right, and we don't contend that there was. I mean, at trial, of course, we may dispute that, but purposes of this record, we don't contend that those potential tax consequences were disclosed to keep. But to address your point about true versus non-true, what that case says is, absent something else, the client is entitled to rely. Well, there's something else in this case is this conflict of interest. It is part and parcel of every claim that is in this case. There are four causes of action. They allege in each cause of action specifically that Tom Ferris was acting under a conflict of interest. That's part of their wrongful conduct, that they allege. They even introduce it in their briefing in this case. It's their story. Their story is that the 2009 transaction was cooked up between Tom Ferris and the children, the benefit to children, at Keith Welland's expense. And what was known to Keith by February of 2012 was the basic facts of that transaction were known. I think as Judge Mott said, they were perfectly clear. Tom told them in those letters, and he then discovered that Tom's got a conflict. Now, if that conflict and that memo, that email, doesn't have anything to do with this claim, why did the estate attach it in opposition to the motion for term of judgment? They put it before the court because it's part of their story about what Tom Ferris did wrong. And Keith knew it. And he also knew he had lost his LP units. Now, for the litigation expenses, the tax consequences, I mean, I can't say any more than that's not injury because they've never come to pass. The state's never paid a penny in taxes as a result of that, not of income taxes. That was the risk there. So in the absence of any concrete injury resulting from the failure to disclose is not a claim. It's just like if you go to the doctor and have a surgery, and the doctor doesn't advise you of some particular risk of the surgery, but it doesn't happen, you don't get to sue the doctor. You've got an approximate cause and injury. With respect to litigation expenses, as I've said before, it's not a separate claim. It's not a separate element of damage. It's just part and parcel of the loss of a share. If he had lost LP units, if he didn't contend that he didn't know, and he took the position of that case, they were stolen from him by the children. If he didn't take that position, he wouldn't have sued. You're talking really fast, and I understand why because you don't have many minutes left, but you can answer this question. In response to the question about the True case, is your argument that True is in opposite because Mr. Wellen knew that Mr. Farassi, whatever, represented one of the children from the start? Is that what you're saying? Yes. That was good. Good for you. You said it much better than I, yes. Exactly. All right. While my time is about up, I'll entertain any other questions. We'd also call the court's attention to our additional sustaining grounds and ask you to consider those as well, and I appreciate your attention. Thank you. Can I turn again? Yes. Back to the question about F&G, the estate's experts didn't pursue those claims, didn't say that was an issue, and therefore, I'd say that the state has already abandoned those claims as bases for a breach of the standard of care. That's how they're discussed in there, is a basis for the breach of the standard of care. F&G, what is that? I'm referring to F&G. If you look on, for instance, page JA-37, which is in the amended complaint, that's where they're referenced, and they speak of aiding and abetting and continuing to represent Welland and one or more of the Welland children after an actual conflict arose. Our experts said those were breaches of the standard of care. They're not an issue. So, Mr. Humphreys, those are abandoned for purposes of this lawsuit, right? Yes, Your Honor. Okay. Back to what we were talking about, these two injuries, the alleged injury. Well, first of all, the February 2012 injury didn't result in an injury. As Tom assured Mrs. Welland, those documents didn't go into effect until Mr. Welland signed them. So, there was no injury. There was no injury to put somebody on notice. They were also different in nature. They were different in that the 2009 transaction was not readily discoverable, and they were different because they were separate and distinguishable. The 2009 transaction has nothing to do with the February 2012. So, Mr. Humphreys, there's no claim here with respect to the personal property. Is that correct? That's correct. Yes, Your Honor. And we're talking about a minuscule amount. Right, right. I understand that. As I understand your argument, you contend that this e-mail train that includes what the district court ruled on dealt with personal property and not the stock transactions that had occurred earlier. That's correct. Is that your argument? Okay. That's part of it, Your Honor. They're separate transactions. They're also the nature of the harm is totally different from what our experts assert in their declarations, actually declarations. And the other point is that the 2009 transaction was not readily discoverable. And if you look at the Benton case and if you look at Judge Norton's opinion where he laid out this three-pronged analysis at JA 1020, the injury from 2009 was certainly not readily discoverable. And George Norton just ignored our expert testimony on that point. And instead... Could you... As you've recognized and your colleague has recognized, we don't have to affirm on the basis of the district court opinion. So, if we talk about the January 6th, 2010 letter from Faraci and the November 9th, 2011 letter doing the same, they explain in quite vivid detail what's going on. Now, you say that they don't explain the tax consequences. And we've been over and over the tax consequences. But leaving aside the tax consequences, what do they not put the decedent on notice of? The tax consequences of the fundamental claim, Your Honor, that we have an issue with. The other parts of the transaction are pretty well evident from the documents. The consequences... Right, they put on notice of the entire... Okay. I thought you were telling... Okay, yeah. All right, fine. Okay. Any other questions? If not, I'll wrap up. I saw George, and I'm reading from the reply read, that your central claim is that Faraci violated the law by failing to adequately inform Keith that he, quote, lost control of the stock as a result of the 2009 transaction. I thought that was your fundamental claim. No, Your Honor. It's based on the tax consequences of the transaction that he would not have done, but for his representations as to them. Just to close out, Your Honor, I would point out that in this instance, the defendants moved for summary judgment twice on this issue. In neither instance did they raise a connection between this email and the 2009 transaction. And I would say that a reasonable jury would reach the same conclusion. That's why Mr. Welland would never have made a connection between the email that Mrs. Welland sent on his behalf and the 2009 transaction. But in our previous discussion just seconds ago, you told me that, in fact, the November 2011 letter and the January 2010 letter did tell him everything he needed to know except the tax transactions or put him on notice of everything, right? So leave aside what the district court relied on and focus on those. And you've already told me that that was sufficient except for the tax consequences. And the consequences of the tax consequences. I mean, given that there's low basis stock and given that, you know, what his finances were, it's laid out in our expert declarations in that regard, what were the breach of the standards of care. And we have four of them that you can reference, Your Honor. Thank you. We appreciate your arguments. Thank you very much. We will go directly to our next panel. Thank you, Your Honors. Thank you.
judges: Diana Gribbon Motz, G. Steven Agee, Barbara Milano Keenan